IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

March 23, 2016 Session Heard at Lincoln Memorial University, Duncan School of Law

**STATE OF TENNESSEE v. MICHAEL D. HERNANDEZ**

**Direct Appeal from the Circuit Court for Anderson County**
**No. A9CR0883      Donald R. Elledge, Judge**

**No. E2015-01365-CCA-R3-CD – Filed September 27, 2016**

An Anderson County Circuit Court Jury convicted the appellant, Michael D. Hernandez, of one count of rape of a child, and he received a twenty-five-year sentence to be served at 100%. On appeal, the appellant contends that the evidence is insufficient to support the conviction; that the trial court erred by refusing to give him access to the victim's statement in an investigator's notes; that the trial court erred by failing to conduct an in camera review of the notes for exculpatory material; that the trial court erred by denying his motion to suppress evidence found in his home; that the trial court erred by defining "on or about" for the jury; that the trial court erred by giving sequential jury instructions; and that cumulative error warrants a new trial. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which, TIMOTHY L. EASTER, J., joined. JOHN EVERETT WILLIAMS, J., filed a separate opinion concurring in part and dissenting in part.

J. Thomas Marshall, Jr., District Public Defender, Clinton, Tennessee, for the appellant, Michael D. Hernandez.

Herbert H. Slatery III, Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Dave Clark, District Attorney General; and Victoria Bannach, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. Factual Background

In March 2013, the appellant was tried for four counts of rape of a child that allegedly occurred "on or about" March 7, March 14, March 21, and March 28, 2009. At trial, the then thirteen-year-old victim testified that she was nine years old in 2009. Her grandmother was married to the appellant, and the victim had known him since she was a baby. The victim lived with her grandmother; the appellant; her then ten-year-old brother; and her then eight-year-old uncle, who was the son of her grandmother and the appellant. The family resided in a three-bedroom home that was located very close to the victim's elementary school. The victim had her own bedroom, her brother and uncle shared a bedroom, and her grandmother and the appellant shared a bedroom.

The victim testified that two or three days after January 26, 2009, which was her ninth birthday, the appellant began touching the inside of her "private" with his fingers. The first incident occurred in the living room while her brother and uncle were in their bedroom. The victim said the incident lasted a few minutes and "hurt a little." The abuse continued and always occurred on the weekends when the victim's grandmother was at work. The victim stated, "Sometimes the boys would be there but they would most likely be in the bedroom or the living room and when the boys were there he did it in the bedroom with the door closed."

The victim testified that the appellant also licked her "private" while her brother and uncle were at a friend's house. On Sunday, March 29, 2009, the appellant came into the victim's bedroom while she was getting ready for church. Her brother and uncle were in their bedroom. The appellant told the victim to "drop" her pants, lay her on the bed, and put his penis inside her vagina. The victim described the appellant's penis as "short" and "fat." The next day, Monday, March 30, the victim's grandmother "got called into work." After the victim got home from school, the appellant touched the inside of her private with his fingers. She said that the appellant used lotion sometimes and that he also put his penis in her mouth "a couple of times" on different occasions.

The victim testified that on Tuesday, March 31, 2009, she told two friends at school about the incidents on Sunday and Monday. One of her friends told her that she should tell a teacher, and the victim did so. The principal later "pulled" the victim out of class and tried to talk with her, but the victim would not speak with him. An employee from the Department of Children's Services (DCS) arrived and talked with the victim. The DCS employee also spoke with the victim's grandmother, and the victim's grandmother was surprised about the victim's allegations. After school, the victim's grandmother took her to a hospital for a physical examination. The next day, the victim spoke with an interviewer at the Child Advocacy Center (CAC). The victim stated that after she revealed the abuse, her grades "started to go really, really bad," and she went to

therapy. The victim said she thought about committing suicide when she was eleven years old.

On cross-examination, the victim testified that the appellant was employed but that he usually worked on days when her grandmother was not working. The victim denied telling anyone at the hospital that the abuse started in 2008 and said she did not remember telling an interviewer that the appellant "did something to [her] butt." The victim did not remember the appellant's abusing her on Saturday, March 8. However, he began licking her vagina on the weekend of March 14. The victim spent the weekend of March 20 with her father. She said that she had a medical condition in which her urethra had not grown since she was three years old and that the condition often caused her to wet the bed at night. When the victim would wet the bed, she would get into bed with her grandmother and the appellant.

Sarah Powell, an investigator with DCS, testified that she received a referral about the victim on March 31, 2009, went to the victim's elementary school, and talked with the victim. At first, the victim was "happy and talking about her friends." However, when Ms. Powell began asking the victim "certain questions," the victim cried and "was shaking a little bit." Ms. Powell "determined that the child was very unsafe in her current condition" and contacted Detective Vaughn Becker and the victim's grandmother. When Detective Becker arrived at the school, Ms. Powell told him about the victim's allegations. At that point, the appellant arrived, and Ms. Powell, Detective Becker, and another officer spoke with him in the library. Detective Becker asked the appellant if he knew why the officers were there, and the appellant said no. The appellant was calm, and Detective Becker told him that allegations had been made about him abusing someone. Ms. Powell said that the appellant's demeanor changed "significantly" and that he got a trashcan. She said that he attempted to throw up in the trashcan but that "it wasn't like a person that was really sick."

Ms. Powell testified that voices were not raised during the meeting and that the meeting was "very calm." At some point, Ms. Powell left the library to set up a "safety plan" for the victim. After she returned, Detective Becker ended the meeting by telling the appellant that "they'd set up something else to talk." Ms. Powell spoke with the victim's grandmother briefly at the school and told her to take the victim to East Tennessee Children's Hospital (ETCH) for a rape kit. A couple of days later, the victim had a forensic interview at the CAC, and Ms. Powell was present during the interview.

The victim's grandmother testified that she had had custody of the victim since the victim was one year old and that she married the appellant in 2010. In 2009, the victim's grandmother worked at Heiskell Market on Thursdays through Sundays. She said that she "would pull five shifts in three days" on the weekends so that she could be at home

with the children during the week.

The victim's grandmother testified that on the afternoon of March 31, 2009, she was at home with the appellant. They were watching television when she received a telephone call from the victim's elementary school. She thought one of the children had done something wrong, so she sent the appellant to the school, which was across the street from their home. About ten minutes later, the appellant telephoned and told her "to get down here now." The victim's grandmother went to the school office. Ms. Powell introduced herself and said she needed to speak with the victim's grandmother about the victim.

The victim's grandmother testified that she went into the library with Ms. Powell, saw Detective Becker, and "was informed of what was going on." She then "signed some paper" and took the victim to ETCH for an examination. The victim's grandmother said that although the victim had not said anything to her about the abuse, she believed "something" had happened to the victim. After the examination, the victim's grandmother arranged for the victim to receive therapy. The victim's grandmother said that the victim loved the appellant "[w]ith all her heart" and that the appellant treated the victim like his own daughter. She acknowledged that the appellant was diabetic and said that she had seen him have episodes in which he would sweat and get dizzy.

The victim's grandmother testified that at some point, she told Detective Becker about a jar of lotion in her home that was used to soften the heels of feet. The jar had a "black and white spotted cow design on it." Detective Becker asked for the jar, so the victim's grandmother went to get it. The jar was usually in the bathroom, but she could not find it.

On cross-examination, the victim's grandmother testified that in 2009, the appellant worked full time. The victim's grandmother worked on Sunday, March 29, but was home all day on Monday, March 30. The appellant was "off" on Tuesday, March 31. The victim's father had visitation with the victim every other weekend, and the victim spent the weekend of March 22 with him. The victim's grandmother said that she had always had a good relationship with the victim and acknowledged that the victim talked with her about what was going on in the victim's life. The victim's grandmother identified two bedspreads that the police had collected from her home and labeled as "item three" and "item four." She said that she usually kept item three on the end of her bed and that she would take item four out of the closet "if someone needed it." On the night of March 30, 2009, the victim wet her bed, so her grandmother removed the soiled sheets and put the two bedspreads on the victim's bed. On redirect examination, the victim's grandmother testified that the family put their dirty clothes into a blue laundry basket. When the basket was full, she washed the clothes.

Detective Vaughn Becker of the Clinton Police Department testified that about 3:30 p.m. on March 31, 2009, he received a call from Ms. Powell about a case involving child sexual abuse and went to the victim's elementary school. The appellant was standing in the lobby, and Detective Becker spoke with Ms. Powell in the library. Shortly thereafter, Detective Russell Barker arrived, and the three of them met with the appellant in the library. The appellant "acted like he was about to get sick" and put his head into a trashcan. Detective Becker said the appellant attempted to throw up "even though he didn't."

Detective Becker testified that his conversation with the appellant was brief, that he did not question the appellant about the facts or details of the allegations, and that he did not reveal the accuser's identity. The appellant did not appear to be sweating or shaking. The victim had alleged that the abuse occurred on Sunday, so Detective Becker was concerned about collecting evidence before someone washed or discarded it. Therefore, his "main conversation" with the appellant related to searching the appellant's home. Detective Becker did not have a written consent form but asked the appellant for permission to search the residence and advised him that he had a constitutional right to refuse. Detective Becker said that he spoke with the appellant in a normal tone and that he was not accusatory. The appellant consented to the search and "said you can look at anything."

Detective Becker testified that the victim's grandmother arrived at the school and left with the three children. The appellant could not have contact with the children during the investigation, so the officers offered to drive him home in order for him to collect personal items. Detective Becker drove the appellant to the residence, and Detective Barker rode with them. When they arrived, Detective Becker again asked the appellant for permission to search, and the appellant gave consent. The three of them went inside, and the appellant began collecting his belongings. Detective Becker said he saw the appellant collect what "looked like a bottle of lotion that had cow spots on the outside" from the bathroom. Detective Becker later tried to obtain the bottle from the victim's grandmother, but she could not find it.

Detective Becker testified that after the appellant collected his personal items, he asked to leave, and Detective Becker said yes. Detective Becker said that he never told the appellant that the appellant could not leave and that the appellant "was free to come and go as he pleased." During the officers' search of the residence, Detective Becker collected two bedspreads from the victim's bed. He stated that the first bedspread, labeled by law enforcement as "item three," was "spread out smooth on the bed like somebody would sleep on it like a fitted sheet that would cover the mattress." The second bedspread, labeled as "item four," was "crumpled up like maybe that's a blanket

that would cover somebody up." Detective Becker also collected two pairs of girls' panties from a blue laundry basket. One pair was on top of the pile of clothes in the basket, and the other pair was under several layers of clothes.

Detective Becker testified that he later collected the victim's rape kit from ETCH and delivered it to the Tennessee Bureau of Investigation (TBI). On April 6, 2009, the appellant left a message on Detective Becker's voicemail, stating that he was rescinding his consent to search. On June 22, 2009, the appellant consented to giving a DNA sample, so Detective Becker obtained a buccal swab from him.

On cross-examination, Detective Becker testified that he did not try to interview the appellant on March 31 and that he did not remember the appellant's asking to get something to eat at the house. About two days after the victim's allegations surfaced, the appellant hired an attorney, so Detective Becker was unable to ask the appellant about the bottle of lotion. When Detective Becker later asked if the appellant would give a DNA sample, the appellant agreed and was cooperative. Detective Becker acknowledged that the clothes in the laundry basket were "all mixed together."

On redirect examination, Detective Becker testified that he overheard the appellant tell the appellant's wife at the school that the victim had made "an allegation." Detective Becker had not revealed the identity of the appellant's accuser to the appellant. On recross-examination, Detective Becker testified that he did not know who talked with the appellant prior to Detective Becker's arrival at the school.

Detective Russell Barker testified that on March 31, 2009, he assisted Detective Becker with the investigation. Detective Barker, Detective Becker, and Ms. Powell went into the library and spoke with the appellant, and the appellant "was advised that an allegation had been made." At that point, the appellant's demeanor changed, and he "claimed to have become ill suddenly." The appellant got a trashcan and spit into it a couple of times but never vomited. Ms. Powell spoke with the appellant about a safety plan, and Detective Becker "asked for consent to search his house, which he agreed to." Detective Becker told the appellant that the search was "completely voluntary and that he didn't have to," and the appellant agreed to the search. The officers never handcuffed the appellant or raised their voices.

Detective Barker testified that he and the appellant rode with Detective Becker to the appellant's home. The appellant opened the door of the residence, and Detective Becker "again asked him if he was completely comfortable with us searching and again advised him that it would be voluntary." The appellant said they could search. The appellant packed a bag, and the officers began searching the home. During the search, the appellant asked if he could leave, and the officers said yes. The detectives collected

two bedspreads from the victim's bedroom and two pairs of panties from a laundry basket. On cross-examination, Detective Barker testified that he did not have a conversation with the appellant about the appellant's blood sugar.

Kenneth David Wicker, an emergency room physician at ETCH, testified as an expert in pediatric and internal medicine that he examined the victim on March 31, 2009. The victim told him that the appellant "had done things to her" at different times during the past year. The victim claimed that the appellant had touched her through her clothes, made her take off her clothes, put her mouth to his penis, and touched her private parts with his penis. The victim also said that the appellant's penis "went in her," but Dr. Wicker stated that "that's hard to know." The victim's genitalia were normal, and Dr. Wicker saw no bruises, tears, or lacerations. The victim's hymen, the membrane over the opening of the vagina, was intact. He said that the victim had some redness around the opening of her vagina but that such redness was not unusual for young girls. The victim said the last incident occurred on March 29, so Dr. Wicker obtained forensic samples for a rape kit.

On cross-examination, Dr. Wicker testified that he did not remember being told that the victim had a short urethra. He stated that in most cases of child sexual abuse, even those involving vaginal penetration, the victim's physical examination was normal.

Keith Proctor, a special agent forensic scientist for the TBI, testified as an expert in serology and DNA analysis that he analyzed the evidence collected in this case. The victim's vaginal swabs failed to show the presence of semen but did show the presence of alpha amylase, a component of saliva. DNA analysis on the alpha amylase matched only the victim's profile. Analysis on the panties found at the top of the laundry basket did not show the presence of semen. Analysis on the panties found in the middle of the laundry basket revealed the presence of semen, but not sperm, in the crotch area. A DNA profile obtained from the crotch area was consistent with the victim. Agent Proctor found semen, but not sperm, on the bedspread labeled "item three." The DNA profile on the bedspread was consistent with a mixture of genetic material. The appellant was the major contributor to the mixture, and an "addition[al] allele" on the bedspread matched the victim. Agent Proctor said that because the bedspread came from the victim's bed, "it wouldn't be uncommon to have the victim's profile in the victim's bed." Agent Proctor did not find semen on the bedspread labeled "item four."

On cross-examination, Agent Proctor testified that it was impossible to know how long the semen had been present on the bedspread labeled item three. However, under the right circumstances and conditions, DNA could be present for an extended period of time. The fact that Agent Proctor found semen, but not sperm, on the victim's panties did not mean that sperm were not present on the panties but that sperm were not present on

the portion of the panties he tested. Agent Proctor acknowledged that DNA could have been transferred to the panties in the laundry basket, but he thought such a transfer was "unlikely." At the conclusion of Agent Proctor's testimony, the State rested its case and dismissed the count of rape of a child on or about March 21, 2009.

The appellant testified that he was born in Texas in 1968 and served in the Army for six years, including the Persian Gulf War. The appellant then lived in Chattanooga and completed an electrical apprentice program to become an electrician. The appellant attended the University of Tennessee in Knoxville from 1997 to 1999 and married the victim's grandmother in 2001. They had one son.

The appellant testified that he and his wife had custody of the victim because the victim's mother had "several different problems" and that the victim had "some anger management issues" when she came to live with them. The appellant stated that he and his wife were "not exactly sure what it transpired from" but that the victim received therapy in 2002. The victim also had a shortened urethra that caused her to wet the bed. When the victim would wet the bed, she would get into bed with the appellant and his wife. However, when the victim was about eight years old, they told her that she was too old to get into their bed. On the night of Monday, March 30, 2009, the victim wet her bed, so her grandmother changed the bedding and put the two bedspreads on the bed.

The appellant testified that he never sexually abused the victim and that the accusations in the library made him physically sick. He said Detective Becker never asked for consent to search his home.

On cross-examination, the appellant testified that Detective Becker told him that the victim had made allegations of sexual abuse and that the officers needed to accompany him to his home in order to ensure he did not have any contact with his wife or the children. The appellant said his lawyer later wrote a statement in which the appellant rescinded "any search or seizures that may have been progressing up to that point." When the appellant left the message on Detective Becker's voicemail, he was reading from the statement. At the time of the victim's allegations, the appellant was working for Lowes. He said that when he was not working, the children were "[n]ot necessarily" with him and may have been with the victim's mother or father.

The jury convicted the appellant of committing rape of a child on or about March 28, 2009, but found him not guilty of committing rape of a child on or about March 7 and March 14, 2009. After a sentencing hearing, the trial court sentenced him to twenty-five years to be served at 100%.

## II. Analysis

A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction due to the victim's lack of credibility, as demonstrated by inconsistencies in her testimony and her failure to report the alleged abuse prior to March 31, 2009, and her normal medical examination. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion,

however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

The victim testified that on Sunday, March 29, 2009, the appellant came into her bedroom, told her to lower her pants, lay her on the bed, and penetrated her vagina with his penis. Although the appellant claims that the victim was not credible, determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "[t]he weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). As to the victim's having a normal physical exam, Dr. Wicker testified that in most cases of child sexual abuse, even those involving vaginal penetration, the victim's physical examination was normal. We note that forensic analysis of the evidence showed the presence of semen on the crotch area of a pair of the victim's panties and a blanket from her bed, both of which were collected just two days after the alleged crime. Taken in the light most favorable to the State, the evidence is sufficient to support the conviction.

## B. Victim's Statement

The appellant claims that the trial court erred by refusing to give him access to the victim's March 31 statement to Ms. Powell, which was included in Ms. Powell's notes. He contends that he was entitled to the victim's statement pursuant to Tennessee Rule of Criminal Proceure 26.2. The State argues that the trial court properly denied the appellant's request because the victim's statement to Ms. Powell did not qualify as a "statement" under the Rule. We agree with the State.

During cross-examination of Ms. Powell, defense counsel asked if she wrote a report regarding her interview with the victim on March 31, 2009. Ms. Powell answered, "Yes, I jot down notes when we are talking and then I type those up." During a bench conference, counsel requested her notes. The State argued that the notes were confidential pursuant to Tennessee Code Annotated section 37-1-612, which makes all reports of child sexual abuse confidential, and, in any event, were not discoverable under Tennessee Rule of Criminal Procedure 26.2, which governs the production of witness statements, because the notes did not qualify as the victim's "statement." The trial court ruled that the defense was not entitled to the notes pursuant to Tennessee Code Annotated section 37-1-612.

Rule 26.2(a), Tennessee Rules of Criminal Procedure, provides,

   After a witness other than the defendant has testified on direct

examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

A "statement" is defined as "[a] written statement that the witness makes and signs, or otherwise adopts or approves" or "[a] substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement." Tenn. R. Crim. P. 26.2(f)(1), (2).

The trial court allowed Ms. Powell's notes to be filed under seal with the appellate record. Upon review of the victim's statement, we cannot say that it meets the definition of a "statement" requiring disclosure under Rule 26.2(f). Ms. Powell's notes include a narrative of her actions on March 31 and quoted statements made by the victim during the victim's interview with Ms. Powell. The notes were not signed, approved, or adopted by the victim, and nothing indicates that they were a verbatim account of the events given by the victim to Ms. Powell. See State v. Biggs, 218 S.W.3d 643, 662 (Tenn. Crim. App. 2006) (holding that summary of forensic interview was not subject to production as witness statement); see also State v. Terrence L. Davis, No. 02C01-9511-CR-00343, 1997 WL 287646, at *8 (Tenn. Crim. App. at Jackson, June 2, 1997) (holding that private investigator's notes, made while interviewing witness, do not qualify as "substantially verbatim recital" of the witness's oral statement under Rule 26.2). Therefore, we conclude that the State was not required to disclose the victim's statement to the appellant under Rule 26.2, Tennessee Rules of Criminal Procedure.

In his separate opinion, Judge Williams agrees that Ms. Powell's notes do not qualify as the victim's "statement" pursuant to Rule 26.2 but concludes that the trial court erred by failing to determine whether Ms. Powell's notes qualified as Ms. Powell's "statement" pursuant to the Rule. We acknowledge that while an interviewer's notes frequently will not qualify as an interviewee's "statement" for the purpose of impeaching the interviewee, as in this case, the notes may be discoverable pursuant to Rule 26.2 for the purpose of impeaching the interviewer. See State v. Robinson, 618 S.W.2d 754, 758-59 (Tenn. Crim. App. 1981). However, the appellant does not argue on appeal that he needed Ms. Powell's notes for the purpose of impeaching Ms. Powell. See Tenn. R. App. P. 36(b). Instead, he repeatedly argues in his brief that he needed Ms. Powell's notes for the purpose of impeaching the victim with inconsistencies in her trial testimony and her statement to Ms. Powell. Accordingly, the trial court did not err by refusing to give the appellant access to the victim's statement.

## C. In Camera Review

In a related argument, the appellant contends that the trial court erred by failing to conduct an in camera review of Ms. Powell's notes for exculpatory information. The State appears to acknowledge that the trial court erred. However, the State argues that the appellant is not entitled to relief because the only value of the notes would be inconsistent statements made by the victim, and defense counsel already had the victim's forensic interview that he could use to cross-examine her. We conclude that the appellant is not entitled to relief.

During the bench conference in which defense counsel asked for Ms. Powell's notes, counsel also asked that the trial court review the notes in camera "to determine exculpatory or contradictory to what the child testified to or what [Ms. Powell] testified to." The court refused, concluding that it could not conduct an in camera review pursuant to State v. Gibson, 973 S.W.2d 231 (Tenn. Crim. App. 1998).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963). Moreover, in Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987), the United States Supreme Court stated that a defendant's constitutional right to confront witnesses against him includes the right to conduct meaningful cross-examination.

In Gibson, upon which the trial court relied, this court held that pursuant to Tennessee Code Annotated section 37-1-612, a criminal defendant had no right to records related to child sexual abuse investigations. 973 S.W.2d at 244. However, in State v. Gwendolyn Hagerman, No. E2011-00233-CCA-R3-CD, 2013 WL 6729912, at *37 (Tenn. Crim. App. at Knoxville, Dec. 19, 2013), a panel of this court held that "the overriding concern is protection of a defendant's confrontation rights at the trial" and that "the majority's holding in Ritchie provides an additional mechanism for protecting a defendant's confrontation rights via in camera review of statutorily protected records." See Charles Ritter v. State, No. E2008-01278-CCA-R3-PC, 2009 WL 3711991 at *8 (Tenn. Crim. App. at Knoxville, Nov. 6, 2009) (stating that "[u]nder Pennsylvania v. Ritchie, a DCS file may be submitted to a trial court for in camera review, and if a defendant is aware of specific information in the file, he may request it from the court and argue its materiality"). The Gwendolyn Hagerman court went on to say that decisions such as the one in Gibson "did not consider the issue in light of Ritchie, and we

- 12 -

do not consider them authoritative." Thus, this court concluded that the trial court should have conducted an in camera review of the records. We also conclude that the trial court should have conducted an in camera review of Ms. Powell's notes.

That said, the appellant will be entitled to relief only if the notes contained information that probably would have changed the outcome of his trial. Gwendolyn Hagerman, No. E2011-00233-CCA-R3-CD, 2013 WL 6729912, at *38 (citing Ritchie, 480 U.S. at 58). We have carefully reviewed the notes, and they contain information that was admitted at trial. While they do contain inconsistencies between what the victim told Ms. Powell and the victim's testimony, defense counsel explored those inconsistencies for impeachment on cross-examination, presumably from the victim's forensic interview at the CAC. Thus, we conclude that despite the trial court's failure to review the notes, they do not contain information that probably would have changed the outcome of the appellant's trial and that the appellant is not entitled to relief on this issue.

## D. Motion to Suppress

The appellant contends that the trial court erred by denying his motion to suppress the evidence found in his home because he did not consent to the warrantless search. The State argues that the trial court properly denied the motion. We agree with the State.

Before trial, the appellant filed a motion to suppress the evidence found in his residence. At the suppression hearing, Detective Becker testified for the State that on March 31, 2009, he went to the victim's elementary school and made contact with the appellant and Ms. Powell. The appellant was sitting in the school library when Detective Becker arrived. Detective Becker said the appellant seemed nervous, acted as if he were going to get sick, and asked for a trashcan but never vomited. Detective Becker spoke with the appellant for ten to fifteen minutes. Detective Barker also was present but did not talk with the appellant.

Detective Becker testified that he asked the appellant if he could search the appellant's house and that he advised the appellant that the appellant could refuse consent. Detective Becker said the appellant told him that he could "look at anything [he] wanted to." The appellant did not ask Detective Becker any questions, and Detective Becker did not have any concerns about the appellant's mental capacity. DCS would not allow the appellant to stay in the home, so Detective Becker offered the appellant a ride home in order for the appellant to get some clothing and personal items. The appellant accepted the offer and rode with Detective Becker in the detective's unmarked patrol car. The appellant and Detective Becker walked to the side door of the home, and Detective Becker again asked the appellant for permission to search. He also told the appellant that

the appellant had the right to refuse consent. Detective Becker said the appellant "let us in" and was very cooperative and helpful.

Detective Becker testified that the appellant was allowed to move freely around the home but that he and Detective Barker watched him and were in close proximity to him for their safety. The appellant gathered clothing and personal items. He was free to leave the residence and did so before the officers finished searching it. During the search, Detective Becker photographed the victim's bedroom and collected two bedspreads from her bed. He also collected two pairs of the victim's panties from the laundry room. He said he and Detective Barker were in the home for twenty to thirty minutes. On April 6, the appellant left a message on Detective Becker's voicemail, "stating that he rescinded his consent to search his property without a warrant."

On cross-examination, Detective Becker testified that the appellant was sitting in the library when he arrived at the school and that he did not know if anyone from DCS had ordered the appellant to stay there. He said that he did not have the appellant sign a consent to search form, that he considered the residence a crime scene, and that he would not have allowed the appellant to return to the house alone. Detective Becker never told the appellant that he was free to leave. On redirect examination, Detective Becker testified that he never told the appellant that the appellant was not free to leave.

The appellant testified that on the afternoon of March 31, he walked to the elementary school to pick up the children. When he arrived, the principal told him that "there was a situation" and that he "needed to go ahead and take a seat." The principal went into his office, and the appellant sat outside the office. About fifteen minutes later, the principal went into the library. After waiting another ten minutes, the appellant asked what was going on and was "informed that there was a situation with [the victim] and that until they got to a certain point with it, [he] had to just sit and wait." The appellant then saw the principal and Detective Becker open the library door. The appellant went into the library and saw Detective Becker, Detective Barker, and Ms. Powell. Ms. Powell "took the actual lead" and talked with the appellant, and the officers told him about an investigation regarding child sexual abuse. No one read him his rights. The appellant said that he was "quite confused" but that Detective Barker said the appellant did not have to talk with them. Ms. Powell had the appellant sign a "no-contact order" and left the room, and the detectives questioned the appellant "about what was going on with [the victim]."

The appellant testified that he was diabetic, was hypoglycemic, and asked for a trashcan. Ms. Powell, who had spoken with the appellant's wife, returned to the library and gave him a copy of the no-contact order. The appellant told the officers that he needed to get some items from his house, and Detective Becker said the officers would

have to go with him. They did not say anything about searching the appellant's residence. Detective Becker drove the appellant to the home, and Detective Barker escorted the appellant to his bedroom and watched the appellant collect his belongings. The appellant's blood sugar was low. He asked Detective Becker if he could get something to eat, but Detective Becker said no. The appellant asked the officers if he could leave, and they said yes. The appellant left through the side door while the officers were in the kitchen. They never asked to search the residence.

On cross-examination, the appellant testified that he never asked to leave the library. He said he felt like he had no choice but to leave his home because DCS was going to remove the children from the house if he did not leave. The appellant later telephoned Detective Becker and told him that "any consent to search was being rescinded." He also told the officer that he was not going to consent to an interview or take a polygraph examination.

Detective Barker testified on rebuttal for the State that when he arrived at the school on March 31, he went into the library with Detective Becker, Ms. Powell, and the appellant. Detective Barker stated, "I think we all walked in at the same time. I don't recall anyone being in there ahead of us." The officers did not question the appellant about the allegations. Detective Becker asked to search the appellant's home, and the appellant said yes. Detective Barker stated that Detective Becker "explained to [the appellant] that it was voluntary and he didn't have to" and that the appellant said the officers could search. The three of them went to the appellant's residence. When they arrived, Detective Becker "described the process" to the appellant and "again made sure that he was comfortable with the search and that it was voluntary." The appellant told the officers that he "didn't have a problem with it." Detective Barker said the appellant was free to leave the home and did so "when he got ready."

At the conclusion of the hearing, the trial court accredited Detective Becker's testimony that he asked for permission to search the home, that he advised the appellant that the appellant could refuse consent, and that the appellant consented to the search. The court noted that Detective Barker's testimony was "consistent and credible" with Detective Becker's testimony and concluded that the appellant freely and voluntarily consented to the search while he was at the elementary school and again when he and the officers arrived at the home. Accordingly, the court denied the appellant's motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings

of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable and, thus, violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). However, "one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." Jackson, 889 S.W.2d at 221. Whether consent exists and "'whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983)). The prosecution bears the burden of proving that the Appellant freely and voluntarily gave consent. See McMahan, 650 S.W.2d at 386.

The appellant contends that the trial court erred by denying his motion to suppress because he testified that the officers never asked for consent to search his residence; therefore, he never gave consent. However, Detectives Becker and Barker testified at the suppression hearing and at trial that Detective Becker asked the appellant for consent to search twice: first in the school library and again when the officers and the appellant arrived at the home. The trial court specifically accredited the officers' testimony. We note that although the appellant claims that he never gave consent to search on March 31, 2009, he acknowledges that he later left a message for Detective Becker in which he "rescinded" any consent. We conclude that the evidence does not preponderate against the trial court's finding that the appellant consented to the search. Thus, the trial court did not err by denying the appellant's motion to suppress.

E. "On or About" Jury Instruction

The appellant contends that the trial court erred by defining "on or about" for the jury. The State argues that the trial court did not err. We agree with the State.

- 16 -

The indictment alleged that the appellant committed rape of a child "on or about" March 7, March 14, March 21, and March 28, 2009. During jury deliberations, the jury asked that the trial court define "on or about." Defense counsel suggested that the court "tell them that they have to use their common sense what on or about means," but the State recommended that the court use a dictionary definition and instruct the jurors that they could "either go by that [definition] or they can go by their common sense." The trial court agreed with the State and provided the following supplemental instruction to the jury:

> Let me direct you that you should, frankly, use common sense in trying to define common words. However, under the Black's Law Dictionary it says, and I'm going to give you a copy of this, on or about is defined as a phrase used in reciting the date of an occurrence or conveyance or the location of it to escape the necessity of being bound by the statement of an exact date or place. Approximately. About. Without substantial variance from and near. . . . That may or may not answer your question. Again, use common sense. That's the Black's Law Dictionary definition of it.

The appellant claims that the definition given by the court, which included the words "approximately" and "near," did not assist the jury and "merely substitute[ed] one vague term for another." He notes that Dr. Wicker testified that the victim told him that the abuse began in 2008 and argues that "[h]ad the jury been told just to use its common sense as to the meaning of the term 'on or about', we would have no fear that Mr. Hernandez was convicted [of] some incident in 2008 of which he had no notice to defend."

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." Dorantes, 331 S.W.3d at 390. "A trial court has the authority to respond to jury questions with a supplemental instruction." Id. at 451. This court "must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." State v. Clark, 452 S.W.3d 268, 295 (Tenn. 2014).

Here, the appellant does not contend that the definition given by the trial court was incorrect. Moreover, the supplemental instruction stated that the jury was to consider it and "common sense." The indictment alleged that the appellant committed the offense on March 28, but the victim testified that the offense occurred one day later on March 29, 2009. The supplemental instruction did not mislead the jury as to the applicable law, nor did it fail to fairly submit the legal issue. Thus, we conclude that the trial court did not err.

### F. Sequential Jury Instructions

Next, the appellant contends that the trial court erred by giving sequential jury instructions, i.e., advising the jury that it could not consider lesser-included offenses until it unanimously acquitted him of rape of a child. Counsel for the appellant acknowledges that he has raised this issue unsuccessfully previously but believes he is "bound to continue to raise this issue." The State argues that the trial court properly gave sequential jury instructions. We agree with the State.

The appellant objected to the sequential jury instructions at trial. However, our supreme court has concluded that "acquittal-first instructions" do not violate a defendant's right to trial by jury. State v. Davis, 266 S.W.3d 896, 912 (Tenn. 2008). Therefore, while we can appreciate counsel's wanting to preserve the issue, we conclude that the appellant is not entitled to relief.

### G. Cumulative Error

Finally, the appellant contends that cumulative error warrants a new trial. We have concluded that the trial court erred by failing to conduct an in camera review of Ms. Powell's notes concerning her interview with the victim on March 31, 2009. We have also concluded, though, that the notes do not contain information that probably would have changed the outcome of the appellant's trial. Finding no other error, cumulative error does not warrant relief.

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE